**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| *MAERSK OIL TRADING INC.* | ) | CASE NO: |
| 140 E 45th Street, Suite 34A | ) | |
| New York, NY 10017, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE: |
| v. | ) | |
| | ) | |
| *B&G FUTURES INC.* | ) | |
| 4084 Holiday St NW | ) | **COMPLAINT** |
| Canton, OH 44718, | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| *CHIRAG VYAS* | ) | |
| 2574 Charter Oak Dr. | ) | |
| Aurora, IL 60502, and | ) | |
| | ) | |
| *STEVE DIPIETRO* | ) | |
| 3039 17th St. NW | ) | |
| Canton, OH 44708 | ) | |
| | ) | |
| Defendants. | ) | |

NOW COMES Plaintiff, Maersk Oil Trading Inc. ("**MOT**"), by and through undersigned counsel, and for its Complaint against Defendants, B&G Futures Inc. ("**B&G**"), Chirag Vyas ("**Vyas**"), and Steve DiPietro ("**DiPietro**") (collectively "**Defendants**") alleges as follows:

1. This is an action for damages suffered by MOT from the fraudulent conduct of Defendants DiPietro and Vyas both in their individual capacities and on behalf of Defendant B&G leading up to and immediately following the execution of a settlement agreement with one of the entities customers.

2. The Court has subject matter jurisdiction over this civil action under 28 U.S.C § 1332 by reason of diversity jurisdiction between B&G, a corporation formed under the laws

of the state of Ohio with its principal place of business in Canton, OH; MOT, a corporation formed under the laws of the state of Delaware with its principal place of business in New York, NY;  Vyas, an individual who resides in and is a citizen of Illinois and serves as either an officer, director, or both of B&G; and DiPietro, an individual who resides in and is a citizen of Canton, Ohio and serves as either an officer, director, or both of B&G.

3.  In addition, this Court has subject matter jurisdiction over this civil action under 28 U.S.C § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs.

4.  This District is a proper venue for this action both because it is a district in which DiPietro resides pursuant to 28 U.S.C. §1391(b), and because it is a district in which B&G is subject to personal jurisdiction pursuant to 28 U.S.C. §1391(c).

## STATEMENT OF THE PARTIES

5.  Plaintiff, MOT, is a corporation formed under the laws of the state of Delaware with its principal place of business in New York, NY.

6.  Defendant, B&G, is a corporation formed under the laws of the state of Ohio with its principal place of business in Canton, OH.

7.  Defendant, Vyas, is an individual who resides in and is a citizen of Illinois and serves as either an officer, director, or both of B&G.

8.  Defendant, DiPietro, is an individual who resides in and is a citizen of Canton, Ohio and serves as either an officer, director, or both of B&G.

## STATEMENT OF FACTS

9.  At all pertinent times B&G was engaged in the business of trading petroleum products and biofuels.

10. At all pertinent times Stark Transloading LLC ("**Stark**"), an affiliate of B&G, was engaged in the business of transportation and logistics of petroleum products and biofuels.

11. At all pertinent times DiPietro served as the president of B&G.

12. At all pertinent times Vyas was authorized to represent B&G and served as Chief Operating Officer of at least a division of B&G.

13. Most relevant communications between MOT and B&G were made through Vyas.

14. Vyas induced MOT into a commercial deal for biofuels in which B&G would sell fuels such as yellow and white grease (the "**Product**") to MOT for further resale, and B&G would also arrange the multimodal carriage of the Product to MOT's facilities through its affiliate Stark.

15. In or about June 2020, Vyas induced MOT to believe that B&G would arrange: (i) the loading of the Product into "flexitanks"; (ii) the delivery of the Product to the agreed FOB delivery place; (iii) the truck and/or rail transportation of the Product from its and/or its affiliate's facilities in Ohio to US East Coast ports (*e.g*., New York and Norfolk); and (iv) the ocean carriage to MOT's onward purchasers of the Product, at facilities in Rotterdam, Netherlands, or elsewhere.

16. Vyas directed samples of Product to be sent to MOT for testing. On July 27, 2020 MOT submitted the samples for testing and the results were deemed to be on-spec and/or of acceptable quality (the "**NMK Analysis**").

### A. *First Sale and Freight Recaps*

17. On August 6, 2020, Vyas induced MOT into issuing a recap for 350 MT of "feedstock," a common term used to describe raw material used to supply or fuel an industrial process. On the same day, MOT confirmed a deal for 350 MT of "*UCO (Choice white and yellow grease)*" at USD 665/MT, FOB Massillon, Ohio (the "**First Sale Recap**").

18. On or around that same time, Vyas also induced MOT into entering into a separate recap for door-to-door carriage of containers, between B&G's Massillon facility and MOT's facility at the APM Terminal in Rotterdam at a price of USD 47,250 (the "**First Freight Recap**").

19. On August 14, 2020, MOT paid $191,885.75 for 288.55 MT of the Product and $47,250 for freight charges.

20. On September 9, 2020, MOT paid for the further 99.41 MT of the Product.

21. On or about October 19, 2020, MOT arranged for 140 MT of the Product to be on-sold to Biogra Trading.

22. Vyas provided to MOT loading reports issued by Stark to show that B&G had delivered the Product in accordance with the terms of the First Sale Recap.

23. Seven containers with the product were loaded on various ships from the US to Rotterdam. The containers arrived in Rotterdam in the second half of September 2020.

24. Starting from October 7, 2020, the Netherlands Food and Consumer Product Safety Authority ("**NVWA**") blocked these containers due to improper import certificates. The containers remained in Rotterdam, incurring storage fees and demurrage which were paid in full by MOT.

25. On November 9, 2020, it became clear that the containers would have to be returned to the US and reshipped. The containers returned to New York and Ohio in January 2021.

26. During 2021, MOT engaged in correspondence with Vyas to obtain a refund of amounts paid under the First Sale Recap and the First Freight Recap. Vyas advised that B&G refused to pay, alleging that it had incurred costs on shipping cargoes from Rotterdam back to the US and that until such costs were calculated, it could not return the prepayments and the freight charges.

**B.** <u>**Second Sale and Freight Recaps**</u>

27. In November 2020, Vyas induced MOT into purchasing 50 additional containers of Product on the basis that the issues with the import certificates had been resolved.

28. Vyas induced MOT to believe that the Product would be transported from B&G's facility in Massillon to Cleveland, Ohio, by truck, then by rail to Norfolk, Virginia, or New York, and then carried to Rotterdam.

29. Vyas induced MOT to believe that on November 25, 2020, B&G had booked 50 container slots with Mediterranean Shipping Company for carriage of used cooking oil to Rotterdam.

30. On December 1, 2020, Vyas induced MOT into issuing a product recap for 1,000 MT +/- 10% UCO and a freight recap under which MOT was to pay $115,000 as "*NVOCC charges*" for "*door to door services Massillon, OH to APM terminals Rotterdam. Duty paid.*"

31. On December 2, 2020, MOT confirmed a deal for 1,000 MT +/- 10% UCO at $715/MT, FOB Massillon, Ohio (the "**Second Sale Recap**"). Several minutes later, MOT confirmed the freight recap (the "**Second Freight Recap**"). The Second Freight Recap was for carriage from Massillon, OH (i.e., the point of FOB delivery) to APM terminals, Rotterdam. The Second Freight Recap provided that the carriage would be on a "duty paid" basis.

32. MOT promptly paid for two batches of the Product – $425,753.90 for 595.46 MT and $287,680.25 for 402.35 MT – as well as $115,000 under the Second Freight Recap.

33. Vyas induced MOT to believe that already in late November / early December 2020, B&G had started loading the product for rail carriage from its Massillon facility via two separate loading reports (the "**Second Loading Reports**"):

34. The Second Loading Reports were the only confirmation given to MOT all 50 flexitanks were loaded in Massillon.

35. The clean on-board bills of lading sent by Vyas to MOT showed that 22 containers did arrive in New York and were loaded on board several vessels.

36. On or about December 16, 2020, B&G was instructed to change the destination of the containers from Rotterdam to Jebel Ali, UAE. This was a requirement under the onward sale contract with Biogra, which materialized in a recap of January 16, 2021.

37. On December 31, 2020, AmSpec released the tests for samples of Product. The tests showed that the Product contained only 2.18% FFA, which was within the acceptable range for the Product to be usable.

38. Vyas induced MOT to believe that 47 containers (or 963.5 MT) of this low-FFA product would be shipped.

39. On January 19, 2021, Vyas sent MOT three emails listing 24 (out of 50) containers as "loaded" on January 15, 2021, without specifying the location of loading. The seal numbers on these containers matched those that Vyas had led MOT to believe were previously loaded in Massillon in November and December 2020. However, only a fraction of the 24 container numbers matched the numbers on containers ultimately received by Biogra.

40. Vyas led MOT to believe that the Product was to be transported in containers fitted with large expandable bags which can fill an entire shipping container ("**flexitanks**").

41. After a flexitank is attached inside a container and Product is then pumped into the flexitank, it is sealed.

42. It is not possible to move a sealed flexitank between containers.

43. As of July 5, 2021, about four months after the arrival of the first container at Jebel Ali (on March 10, 2021) only 22 containers out of 50 (or 434.322 MT out of 1,000 MT) were delivered.

44. Test results in Jebel Ali showed that the Product in at least 8 containers (out of the 22 containers received) had extremely elevated FFA levels. This made the Product commercially unusable for the purpose for which it was performed.

45. The remaining 28 containers remained undelivered to Biogra.

46. The delays in delivery, product quality issues, or both led to the cancellation of the contract by Biogra.

### C. *Third Sale and Freight Recaps*

47. On April 19, 2021, Vyas induced MOT into issuing a recap for 650 MT +/- 10% of Product, FOB Massillon. On April 27, 2021, Vyas induced MOT into issuing a freight recap for door-to-door delivery from Massillon to Jebel Ali.

48. On April 28, 2021, MOT issued the recap for the requested quantity of Product, at $885/MT (the "**Third Sale Recap**"). On the same day, MOT also confirmed the recap for freight charges (the "**Third Freight Recap**").

49. B&G then issued invoices for 664.68 MT of the product ($588,241.80) and for associated freight charges ($202,860).

50. On May 4, 2021, Vyas provided loading reports issued by Stark in support of B&G invoice to induce MOT to believe that all 33 flexitanks of this batch of Product had been loaded in Massillon, Ohio, already in March 2021 (*i.e.*, over a month before the recap).

51. On April 21, 2021, Vyas induced MOT to believe that B&G had booked slots for 50 containers with ETAs Jebel Ali in June-July 2021.

52. On June 2, 2021, MOT wrote to B&G saying that MOT intended to cancel both the Third Sale Recap and Third Freight Recap.

### D.  *Fourth and Fifth Sale and Freight Recaps*

53. On February 17, 2021, Vyas induced MOT into issuing a recap for 650 MT +/- 10% of Product, FOB Massillon.

54. The next day, MOT confirmed the recap for this quantity at USD 855/MT (the "**Fourth Sale Recap**"). Vyas led MOT to believe that loading and delivery would both occur in February 2021.

55. On February 19, 2021, after being induced by Vyas into doing so, MOT issued a freight recap for NVOCC charges to carry the product from Massillon to APM Terminal in Rotterdam (the "**Fourth Freight Recap**").

56. On February 22, 2021, B&G invoiced MOT for 598.8 MT of the product ($512,059.50) and for associated freight charges (the "**Invoice Fourth Freight Recap**").

57. According to the loading reports issued by Stark and produced by Vyas in support of the Invoice Fourth Sale Recap, the Product had already been loaded in Massillon in early February 2021, a few weeks prior to entering into discussions regarding the potential sale contract of these 650 MT +/- 10% of Product.

58. On February 26, 2021, Vyas induced MOT into issuing another recap, this time for 750 MT +/- 10% of Product, FOB Massillon. The same day, MOT confirmed the deal for this quantity at $860/MT (the "**Fifth Sale Recap**"). Vyas implied that loading was to take place during the week between February 15 and 19, 2021 on the basis of the subject of MOT's confirmation emails.

59. On March 3, 2021, B&G invoiced MOT for 658.74 MT of the Product ($566,516.40).

60. The Stark reports supporting the invoice stated that all Product had already been loaded in Massillon on February 15, 2021 (the "**Fifth Loading Reports**").

61. MOT intended to resell all of the entire under the Fourth and Fifth Sale Recaps to BP. MOT and BP negotiated the resale contract since late February 2021.

62. On March 19, 2021, BP and MOT confirmed the deal (the "**BP Resale Contract**").

63. B&G was aware of MOT's negotiations with BP, and of BP's requirements. MOT regularly forwarded the negotiations emails to B&G.

64. In total, Vyas conveyed that B&G had made bookings for 62 containers to carry the Product under the BP Resale Contract.

65. On April 19, 2021, B&G requested MOT to issue another freight recap for NVOCC charges in the amount $125,750.68 which was promptly confirmed by MOT (the "**Fifth Freight Recap**").

66. B&G invoiced MOT for this sum on the same day.

67. On June 8, 2021, BP sent MOT a formal letter of demand stating that only five containers were delivered.

68. On June 24, 2021, BP notified MOT that the five containers received came in significantly off-spec, and BP rejected the containers. A sixth, and final, container later arrived and was also off-spec.

69. The remaining 56 containers were never received by BP. B&G admitted that only six containers were delivered to BP.

70. The BP Resale Contract was cancelled by BP for delays in delivery, breach of contract as to quality, or both.

### E.  *Inquiries to Locate Containers*

71. Despite repeated requests from MOT for documentation regarding the arranged transportation of the Product to be provided, B&G, through Vyas, repeatedly failed to provide it. B&G never provide transportation documents showing the Product was transported to Rotterdam and Jebel Ali.

72. Inquiries were made with Stark. Stark failed to provide any additional documentation.

73. From all the Loading Reports issued by Stark, MOT was induced to believe that all of the Product under all of the Sale Recaps had been shipped. MOT has made repeated attempts to corroborate this information with the relevant transportation providers and terminals/ports.

74. Despite MOT's inquiries, it was not possible to obtain any information which would corroborate that B&G had delivered all the containers which the Loading Reports issued by Stark and produced by Vyas induced MOT to believe.

75. Only 22 containers (out of 50 containers) were received by Biogra, out of which eight were off specification.

76. Only six containers (out of 62 containers) were received by BP, out of which all six were off specification.

77. B&G had no intention of fulfilling its contractual obligations owed to MOT at any time.

78. In providing loading reports which induced MOT to believe that the Product purchased was being shipped to its end-recipients, Stark, as an affiliate/subsidiary of B&G, knowingly induced MOT to keep purchasing more Product from B&G and entering into on-sale contracts with third parties.

### F. *English Proceedings & Settlement Agreement*

79. On January 14, 2022, MOT filed a claim in the High Court of England and Wales against B&G for the losses and damages in the equivalent sum of approximately $3,437,000.

80. Having received confirmation of Commercial Court case number CL-2022-000018 in the High Court of England and Wales against B&G (the "**English Proceedings**"), Vyas individually and as a director/officer of B&G, through protracted fraudulent promises and inducements, sought to induce MOT to dismiss the claim in exchange for a settlement.

81. On information and belief, Vyas knew that B&G had no intention to pay this settlement.

82. DiPietro, individually and as a director/officer of B&G, was copied in on the correspondence with MOT's counsel and was fully cognizant of the negotiations taking place, of the protracted promises and inducements, and sought to induce MOT to dismiss the claim in exchange for a settlement through.

83. As a director, corporate officer, legal representative, or any combination of the same for B&G, DiPietro had actual knowledge of B&G's financial position.

84. DiPietro knew that B&G had no intention to pay this settlement.

85. A particular negotiated term under the Settlement Agreement was the payment dates. By an email of April 4, 2022, Vyas, with DiPietro in copy, confirmed that "*we believe half of the payment can be made within approximately 45 days*" and that "*unfortunately I do not have an approximate [sic] on the second payment yet.*"

86. Following a series of calls and email exchanges with Vyas, the terms of the settlement were finally agreed on April 13, 2022, with B&G to pay MOT $2,100,000 via two lump-sum payments (on May 28, 2022 and on July 12, 2022).

87. The terms of the settlement were memorialized via a contract executed by the parties, with Vyas formally signing the settlement on May 2, 2022 (the "**Settlement Agreement**").

88. The Settlement Agreement provided that it was to:

> a. Resolve all disputes between the parties arising out of the First, Second, Third, Fourth, and Fifth Sale Recaps;

> b. Resolve all disputes between the parties arising out of the First, Second, Third, Fourth and Fifth Freight Recaps; and

> c. Conclude the English Proceedings.

89. Despite being obliged to do so under Section 22 of the Settlement Agreement and despite numerous requests made to Vyas, B&G failed to mail signed copies of the Settlement Agreement to MOT or its counsel. B&G provided only a photographic version of their signed Settlement Agreement.

90. Pursuant to its Section 7 and in exchange for the parties entering into the Settlement Agreement, MOT has concluded the English Proceedings.

91. Vyas gave repeated assurances to MOT or MOT's counsel that B&G had funds to meet its payment obligations under the Settlement Agreement.

92. Vyas specifically negotiated and agreed a payment plan under the Settlement Agreement.

93. DiPietro failed to rebut any of Vyas' assurances to MOT despite knowing that B&G could not or would not honor any of the payment obligations under the Settlement Agreement.

94. B&G did not honor any of its obligations under the Settlement Agreement.

95. On May 29, 2022, MOT's legal counsel sent B&G notice pursuant to Clause 8(i) of the Settlement Agreement because of B&G's failure to make payment.

96. B&G failed to make payment.

97. As a result, pursuant to Clause 8(ii), the sum of $2,100,000 became due and payable, without further notice, and enforceable. In addition, MOT became entitled to interest at the rate of 8 percent per annum plus its attorney's fees and costs, including those incurred in obtaining a judgment by confession or otherwise, as a result of B&G's default, and in executing and collecting on any said judgment.

### G.  *Ohio Proceedings*

98. Because B&G did not honor any of its obligations under the Settlement Agreement MOT was forced to pursue cognovit judgment in the Stark County Court of Common

Pleas and did so in Case No. 2022-CV-01382 on August 26, 2022 (the "**Ohio Proceedings**").

99. On August 29, 2022, the Stark County Court of Common Pleas rendered judgment against B&G and in favor of MOT in the amount of $2,100,000 plus interest and costs (the "**Cognovit Judgment**").

100. To date, B&G has failed to pay the Cognovit Judgment.

### H. *B&G's Financial Shell Game*

101. Under the terms of the Sale Recaps, MOT was to make payment to B&G into an account held by B&G at J.P. Morgan Chase Bank, N.A. ("**JP Morgan**") (the "**JP Morgan Account**").

102. At all relevant times during the negotiation of the Sale Recaps, the Freight Recaps, and the Settlement Agreement, the JP Morgan Account was subject to an involuntary injunction and garnishment in the United States District Court for the Northern District of Ohio, Eastern Division, following a default judgment ordered against B&G in Case No. 5:20-cv-02560 on January 25, 2021.

103. Two weeks later, on February 12, 2021, the Court of Common Pleas of Stark County, Ohio released a hold placed on an account held solely by Steven P. DiPietro, Inc., but ordered holds remain on accounts held by B&G, Vyas, and DiPietro until further order by the court.

104. On or about August 26, 2019, Ichor Oil entered into an agreement with B&G to buy 110,000 barrels of fuel oil for $350,000.

105. On information and belief, Ichor Oil duly transferred the agreed balance to the IOLTA client trust account of B&G's lawyer, Andrea Ginella, at PNC Bank.

106. On information and belief, despite this payment being made, B&G failed to fill the order, in so doing, displaying a propensity to partake in fraudulent business practices similar to that exhibited during the course of their dealing with MOT.

107. On February 19, 2021, being the date JP Morgan received the garnishment from Stark County, Ohio, B&G had a total of $340.15 in the JP Morgan Account and its PNC Bank Account.

108. On July 28, 2021, JPMorgan answered the garnishment by indicating "*No Funds Available*".

109. This meant, in addition to any other funds that may have existed in that account, B&G had depleted at least $2.8 Million that MOT had paid into that account just months after the last of the money was wired into it.

110. On August 6, 2021, the United States District Court for Northern District of Texas placed a garnishment on B&G's bank accounts.

111. On September 10, 2021, PNC responded to a writ of garnishment, stating the current balance held by them for B&G was $103,290.39.

112. On September 15, 2021, DiPietro filed an affidavit in the United States District Court for the Northern District of Texas regarding dishonored transactions due to a hold on B&G's bank accounts stating that "the writs of garnishment served in connection with the above-referenced case, are causing B&G Futures, Inc. significant financial distress *and may soon put it out of business*." [Emphasis added.]

113. Vyas and DiPietro each knew B&G was not in a financially stable position to fulfill its contractual obligations and had no intention of fulfilling the contracts they entered into on B&G's behalf with MOT.

114. On information and belief, Vyas and DiPietro transferred the funds received from MOT into various other accounts owned by B&G, Vyas, or DiPietro, thereby reducing available funds so as to prevent any creditor or future creditor, including MOT, from recovering the losses caused by the conduct of Vyas and DiPietro.

115. On information and belief, assets were transferred between subsidiary companies at the behest of Vyas DiPietro when creditor action was anticipated, preventing any

creditor or future creditor, including MOT, from recovering the losses caused by the conduct of Vyas and DiPietro.

## COUNT I – FRAUD (Settlement Agreement)

116. MOT repeats and realleges each and every allegation set forth in paragraphs 1 through 115 as though fully set forth herein.

117. Vyas and DiPietro, acting individually and on behalf of B&G as directors/officers, knew or should have known that B&G could not or would not pay the monetary obligation it owed MOT under the Settlement Agreement or recklessly disregarded the truthfulness of their statements that B&G would pay.

118. Vyas and DiPietro, acting individually and on behalf of B&G as directors/officers, knowingly or recklessly giving false assurances regarding B&G's financial position and ability to make the funds available to MOT under the specified timeframes in order to meet its payment obligations under the Settlement Agreement.

119. Vyas and DiPietro, acting individually and on behalf of B&G as directors/officers, knowingly or recklessly misrepresenting B&G's willingness and intention to meet its obligations under the Settlement Agreement, and in fact did not honor any of B&G's obligations under the Settlement Agreement.

120. Vyas and DiPietro made these assurances with the intent to mislead MOT and induce MOT to enter into the Settlement Agreement.

121. B&G's ability and willingness to pay its monetary obligations under the Settlement Agreement were material to MOT's decision to enter into the Settlement Agreement.

122. MOT reasonably and justifiably relied upon Vyas' and DiPietro's assurances that B&G had the funds available to meet its payment obligations under the Settlement Agreement to MOT's detriment by forfeiting any other remedies MOT had available to collect the money that was due and owing to it, including Commercial Court case number CL-2022-000018 in the High Court of England and Wales.

123. Under Ohio law, corporate officers may be held personally liable for torts committed while acting within the scope of their employment. See *Altram v. Star Tool & Die Corp.*, 64 Ohio App.3d 388, 393 (8th Dist. 1989); see also *Yo-Can, Inc. v. The Yogurt Exchange, Inc.*, 149 Ohio App.3d 513, 526 (7th Dist. 2002).

124. As a direct, foreseeable, and proximate result of Vyas and DiPietro's fraudulent assurances, MOT has been damaged in an amount in excess of $2,100,000.

## <u>COUNT II – NEGLIGENT MISREPRESENTATION</u>

125. MOT repeats and realleges each and every allegation set forth in paragraphs 1 through 115 as though fully set forth herein.

126. Throughout protracted communication, Vyas communicated, and DiPietro, through his willful blindness and failure to correct information he knew or ought to have known to be false, negligently misrepresented to MOT that B&G would provide the Product in the appropriate quantity and quality and would ship it to the correct location in exchange for the money paid by MOT to B&G under the various Sale and Freight recaps.

127. After B&G failed to provide the Product to MOT and MOT initiated Commercial Court case number CL-2022-000018 in the High Court of England and Wales on January 14, 2022, Vyas communicated, and DiPietro, through his intentional willful blindness and failure to correct information he knew or ought to have known to be false, communicated to MOT that B&G would honor the terms of the Settlement Agreement in exchange for MOT's dismissal of the action.

128. Throughout the settlement negation process which commenced on January 22, 2022, and through Vyas signing the Settlement Agreement on May 2, 2022, Vyas communicated, and DiPietro, through his intentional willful blindness and failure to correct information he knew or ought to have known to be false, negligently misrepresented that B&G had the funds readily available to honor the payment obligations in the manner detailed in the subsequent Settlement Agreement.

129. MOT relied on Vyas and DiPietro's false information justifiably and in good faith.

130. Under Ohio law, corporate officers may be held personally liable for torts committed while acting within the scope of their employment. See *Altram v. Star Tool & Die Corp.*, 64 Ohio App.3d 388, 393 (8th Dist. 1989); see also *Yo-Can, Inc. v. The Yogurt Exchange, Inc.*, 149 Ohio App.3d 513, 526 (7th Dist. 2002).

131. As a direct and proximate result of Vyas and DiPietro's negligent misrepresentations, B&G, Vyas and DiPietro have been unjustly enriched and MOT has been damaged in an amount in excess of in excess of $2,100,000.

### COUNT III – FRAUDULENT INDUCEMENT (Settlement Agreement)

132. MOT repeats and realleges each and every allegation set forth in paragraphs 1 through 115 as though fully set forth herein.

133. Vyas and DiPietro, acting individually and on behalf of B&G as directors/officers, represented that B&G had the funds readily available and would be willing to pay the monetary obligation it owed MOT under the Settlement Agreement or recklessly disregarded the truthfulness of their statements that B&G would pay.

134. Vyas, acting individually and on behalf of B&G as a director/officer, made those representations to MOT in order to induce MOT to enter into the Settlement Agreement and forfeit any other remedies MOT had available to collect the money that was due and owing to it, including Commercial Court case number CL-2022-000018 in the High Court of England and Wales.

135. DiPietro, acting individually and on behalf of B&G as a director/officer and through his intentional willful blindness and failure to correct information he knew or ought to have known to be false, made those representations to MOT in order to induce MOT to enter into the Settlement Agreement and forfeit any other remedies MOT had available to collect the money that was due and owing to it, including Commercial Court case number CL-2022-000018 in the High Court of England and Wales.

136. B&G's ability and willingness to pay its monetary obligations under the Settlement Agreement were material to MOT's decision to enter into the Settlement Agreement.

137. MOT reasonably and justifiably relied upon Vyas' and DiPietro's assurances that B&G had the funds available to meet its payment obligations under the Settlement Agreement to MOT's detriment by forfeiting any other remedies MOT had available to collect the money that was due and owing to it, including Commercial Court case number CL-2022-000018 in the High Court of England and Wales.

138. Under Ohio law, corporate officers may be held personally liable for torts committed while acting within the scope of their employment. See *Altram v. Star Tool & Die Corp.*, 64 Ohio App.3d 388, 393 (8th Dist. 1989); see also *Yo-Can, Inc. v. The Yogurt Exchange, Inc.*, 149 Ohio App.3d 513, 526 (7th Dist. 2002).

139. As a direct, foreseeable, and proximate result of Vyas and DiPietro's fraudulent assurances, MOT has been damaged in an amount in excess of $2,100,000.

## PRAYER FOR RELIEF

WHEREFORE, MOT accordingly demands judgment against Chirag Vyas, Steven DiPietro, and B&G Futures Inc., jointly and severally, as follows:

A.     An award of damages in favor of MOT against Chirag Vyas, Steven DiPietro, and B&G Futures Inc. for all losses and damages incurred as a result their fraudulent conduct;

B.     An award of damages in favor of MOT against Chirag Vyas, Steven DiPietro, and B&G Futures Inc. in an amount equal to any damages it suffered directly and consequentially;

C.     Judgment in favor of Plaintiff and against Vyas and DiPietro and an order piercing the corporate veil as necessary to hold Vyas and DiPietro personally liable for the fraudulent, negligent misrepresentation, fraudulent inducement, and other illegal and unlawful acts at issue in this Complaint and as detailed herein;

D.     Attorneys' fees;

E.     Prejudgment interest;

F.     Punitive damages pursuant to Ohio Rev. Code §2315.21; and

G.     Any other relief that this Honorable Court may deem to be just and proper.

Dated: May 10, 2023

Respectfully submitted,

MAERSK OIL TRADING, INC.,
Plaintiff,

s/ ***Zachary J. Barger***

Its attorney

Zachary J. Barger (0089304)
**Zeiler Floyd Zadkovich (US) LLP**
53 West Jackson Blvd., Suite 1240
Chicago, Illinois 60604
Tel.: (567) 208-9890
Email: zach.barger@zeilerfloydzad.com